# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### BLUEFIELD DIVISION

THE COUNTY COMMISSION OF
MCDOWELL COUNTY,

        Plaintiff,

                                   Case No.: 1:17-cv-00946

v.                                  Judge David A. Faber

MCKESSON CORPORATION,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH 110,
LLC, and HAROLD ANTHONY COFER, Jr.,
M.D.,

                  Defendants.

## AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(1)(A) and this Court's extension of time file a response (ECF No. 21), Plaintiff, the County Commission of McDowell County, files this Amended Complaint and sues Defendants McKesson Corporation; Amerisource Bergen Drug Corporation; Cardinal Health 110, LLC; and Harold Anthony Cofer, Jr., M.D. ("Dr. Cofer"), and for causes of action states as follows:

## I.    INTRODUCTION

1.    This matter involves a serious breach of the public trust which has resulted in drug abuse, misuse and overdose deaths.  Like sharks circling their prey, multi-billion dollar companies, along with smaller players like local physicians, descended upon Appalachia for the sole purpose of profiting off of the prescription drug fueled feeding frenzy commonly referred to, and more fully explained below as, the opioid epidemic.

2.      As distributors of dangerous products like narcotics, these companies bore a rather significant duty to ensure that the drugs did not end up in the wrong hands.  In exchange for promising to honor their obligations, each of the defendants was licensed and/or registered by the West Virginia Board of Pharmacy and ultimately received compensation in the form of millions of dollars per year for shipping volumes of drugs well beyond what a reasonable company would expect.

3.      Unfortunately for everyone except Defendants, these dangerous and addictive drugs did end up in the wrong hands.  These drugs were diverted, misused, and abused, to the point where citizens of West Virginia, including residents of McDowell County, lost their jobs, health and even their lives.  Left in the wake of this malfeasance are small towns and counties like McDowell, to clean up the mess and try to restore order while Defendants sit back and count the money they made off of their misdeeds.

4.      When the dangerous and addictive drugs caused harm to the public health of McDowell County residents in the form of addiction, overdose and death, the Defendants were nowhere to be seen, but McDowell County was there to dispatch emergency services, run drug treatment programs, investigate overdoses, care for the infirm and transport dead bodies.

5.      When the dangerous and addictive drugs caused harm to the public utilities of McDowell County in the form of litter and damaged and destroyed public property, among other things, the Defendants were nowhere to be seen, but McDowell County was there to enforce codes, clean up streets and neighborhoods, and repair and/or replace damaged and destroyed public property.

6.     When the dangerous and addictive drugs caused increases in crime in McDowell County, the Defendants were nowhere to be found, but McDowell County was there to dispatch police, prosecute cases, supervise offenders in jail and eventually place them back into society.

7.     This action is therefore brought to recoup the expenses and recover the damages suffered by McDowell County, as caused in whole or in part, by the actions of Defendants.

## II.   PARTIES

8.     Plaintiff, the County Commission of McDowell County is the duly elected political body of McDowell County, a political subdivision of the state of West Virginia.  The County Commission of McDowell County brings this action on behalf and for the benefit of McDowell County pursuant to W.Va. Code §§7-1-1 and 8-12-1(3).  Plaintiff is hereinafter referred to as "McDowell County."

9.     The collective actions of Defendants have caused and will continue to cause McDowell County to expend substantial sums of public funds to deal with the significant consequences of the opioid epidemic that was fueled by Defendants' illegal, reckless, and malicious actions in flooding the state with highly addictive prescription medications without regard for the adverse consequences to McDowell County or its residents.

### a.   MCKESSON CORPORATION

10.     McKesson Corporation (hereinafter "McKesson") is a Delaware Corporation with headquarters in California that conducts business in West Virginia.

11.     Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

12.    McKesson is the largest pharmaceutical distributor in North America.  McKesson delivers approximately one third of all pharmaceuticals used in North America.

13.    McKesson does substantial business in the state of West Virginia wherein it distributed pharmaceuticals to at least 52 of West Virginia's 55 counties, including significantly in McDowell County.

14.    From 2007 to 2012,[1] McKesson distributed 46,179,600 doses of Hydrocodone and 54,304,980 doses of Oxycodone for a total of 99,484,580 doses of Hydrocodone and Oxycodone to West Virginia during the six year period; with 2,337,660 Hydrocodone doses, and 1,457,400 Oxycodone does going to McDowell County alone.

15.    In addition to Oxycodone and Hydrocodone, McKesson distributed high quantities of several other scheduled narcotics to pharmacies throughout the state including formulations of fentanyl and suboxone which have quickly become centerpieces in the opioid epidemic.

b. CARDINAL HEALTH 110 LLC

16.    Cardinal Health 110 LLC (hereinafter "Cardinal") is an Ohio Corporation that conducts business in West Virginia.

17.    Like McKesson, Cardinal distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

18.    Cardinal is the third largest pharmaceutical distributor in North America.

---

[1] Plaintiff's reference to statistics from 2007 to 2012 should not be construed as a limitation on the timeframe during which Defendants' misconduct occurred.  Rather, these years are simply the timeframe for which Plaintiff already possesses significant statistical data.  Plaintiff intends to discover Defendants' distribution amounts for later time periods during the course of discovery in this case.

19.    Cardinal does substantial business in the state of West Virginia wherein it distributed pharmaceuticals to at least 52 of West Virginia's 55 counties, including significantly in McDowell County.  Cardinal distributed 97,629,010 doses of Hydrocodone and 85,348,240 doses of Oxycodone for a total of 182,977,250 doses of Hydrocodone and Oxycodone to West Virginia during the six year period from 2007 to 2012,[2] with 3,052,370 Hydrocodone doses, and 1,492,960 Oxycodone doses going to McDowell County alone.

c.    AMERISOURCEBERGEN DRUG CORPORATION

20.    AmerisourceBergen Drug Corporation (hereinafter referred to as "ABDC") is a Delaware Corporation that conducts business in West Virginia.

21.    Like McKesson, ABDC distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

22.    ABDC is the second largest pharmaceutical distributor in North America.

23.    ABDC is a registrant with the West Virginia Board of Pharmacy and does substantial business in the state of West Virginia wherein it distributed pharmaceuticals in McDowell County.

24.    Specifically, ABDC distributed 80,586,670 doses of Hydrocodone and 38,322,820 doses of Oxycodone for a total of 118,909,490 doses of Hydrocodone and Oxycodone to West Virginia during the six year period 2007 to 2012,[3] with 1,467,900 Hydrocodone doses, and 193,000 Oxycodone doses going to McDowell County alone.

d.    DR. HAROLD ANTHONY COFER, JR.

25.    Dr. Cofer has been licensed to practice in West Virginia since 1981 (medical license number 12594).

---

[2] *See supra* note 1 regarding statistics from 2007 to 2012.
[3] *See supra* note 1 regarding statistics from 2007 to 2012.

26.     Dr. Cofer practiced medicine in neighboring Northfork from 2012 through 2015. Dr. Cofer currently practices in Bluefield, West Virginia (Mercer County).

27.     Over the relevant time period, Dr. Cofer wrote prescriptions for medications, including but not limited to schedule II opioids, to individual patients at his office in McDowell County.

## III.     JURISDICTION AND VENUE

28.     The West Virginia State Courts have jurisdiction over this case[4] and over Defendants pursuant to the provisions of W.Va. Code § 56-3-33.   Federal subject matter jurisdiction does not exist.

29.     Venue is appropriate in McDowell County as the acts and practices of the Defendants occurred in and caused the damage in McDowell County.  Additionally, during the relevant time period, Dr. Cofer knowingly treated patients and prescribed opioids to residents of McDowell County and was aware that a great majority of his prescriptions were filled at pharmacies located within McDowell County.

## IV.     FACTUAL BACKGROUND

30.     Within the last 20 years, a scourge has infected this country, particularly in greater Appalachia and West Virginia.  McDowell County is ground zero for this plague, where it has destroyed lives and ruined local economies.  The scourge is popularly known as the "opioid epidemic."[5]

---

[4] Plaintiff's contest—and do not concede—that federal subject matter jurisdiction exists over this matter, as set forth in their Motion to Remand, filed concurrently herewith.
[5] L. Manchikanti et al., *Opioid Epidemic in the United States*, *available at* https://www.ncbi.nlm.nih.gov/pubmed/22786464.

31.     Opioids are effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[6]  However, opioids are addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort.

32.     As pharmaceutical distributors and a practicing physician, Defendants have known for years that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

33.     Defendants knew also that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was much less significant. The U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

34.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, as well as generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, and thus, they are regulated as controlled substances.[7]

---

[6] "Originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics." Stedman's Medical Dictionary 27th Edition.

[7] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by pharmacist who has verified that it is a valid prescription.

35.     Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain.  Opioids also can create a euphoric high, which can also make them addictive.  At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

36.     Defendants herein each played a key part in the creation, proliferation, and continuation of the opioid epidemic and the resulting catastrophic damage.

37.     Defendants each profited while disregarding the impact that their actions had on the people under the spell of these drugs and the cities and towns where they lived.

38.     Defendants each played a key role in the distribution and prescribing of opioids over the relevant time period.  Simply put, the scheme could not have worked without each Defendant playing their respective part or at a minimum, remaining silent about the absurd volume of drugs which they were collectively shipping into or prescribing for McDowell County.

39.     Opioids—once a niche drug—are now the most prescribed class of drugs; more than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.   Together, opioids generated $8 billion in revenue for drug companies in 2012, a number that exceeded $15 billion in 2016.

40.     Moreover, opioid abuse has not displaced heroin, but rather has triggered resurgence in its use, imposing additional burdens on McDowell County and local agencies that

address heroin use and addiction.   For instance, Huntington, West Virginia experienced 27 heroin overdoses in the span of four hours on August 15, 2016.[8]

41.     According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002 to 2004 to 45.2% in 2011 to 2013.  Heroin produces a very similar high to prescription opioids, but is often cheaper.  While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price. It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

42.     Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opines that opioids are more destructive than crack cocaine:

> "[Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[9]

43.     Pharmaceuticals like opioids are not sold directly to physicians or pharmacies for ultimate dispensing.  Rather, there is a sophisticated system which distributes the drugs across the nation.

44.     Make no mistake; the role of the pharmaceutical distributor is not simply one of freight forwarder or shipper.  Each of the Defendant distributors is a member of the trade group

---

[8] See http://www.cnn.com/2016/08/17/health/west-virginia-city-has-27-heroin-overdoses-in-4-hours/index.html
[9] Transcript, Use and Abuse of Prescription Painkillers, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.

Healthcare Distribution Alliance (HDA), formerly known as the Healthcare Distribution Management Association (HDMA).   According to the HDA, the leading trade group of distributors, "[h]ealthcare distribution has never been just about delivery. It's about getting the right medicines to the right patients at the right time, safely and efficiently."[10]

45.     In fact, as the dominant players within the healthcare distribution industry, senior executives from each of the Defendant distributors have historically served on the board of the HDA or HDMA.  Currently, Cardinal's CEO Jon Giacomin serves as the Chairman of HDA. ABDC's President Robert Mauch and McKesson's President Mark Walchirk are both on the current executive committee of this powerful trade group.

46.     The current website for HDA explains that "[w]hile distributors do not prescribe or dispense drugs directly to patients, they do share a common goal with physicians, manufacturers, pharmacists, law enforcement officials and policymakers: to ensure a safe supply of medicines. Among other safeguards, **distributors are dedicated to keeping prescription painkillers out of the hands of people who may use them for purposes other than those for which they are intended**."[11] (emphasis added)

47.     According to their website, members of HDA, including the Defendant distributors named herein, are committed to addressing the threat of prescription painkillers ending up in the wrong hands.  Their multilayered approach includes the following:

- Our members register with the DEA and follow rigorous statutory and regulatory requirements for the storage, handling and distribution of controlled substances. These sophisticated security systems and processes help safeguard the supply chain.

---

[10] See http://www.hdma.net/about/role-of-distributors

[11] See http://www.hdma.net/issues/prescription-drug-abuse-and-diversion

- Pharmaceutical distributors coordinate with a range of supply chain partners, as well as federal and state regulatory agencies, to help prevent the diversion of prescription drugs.

- We work with supply chain stakeholders, including pharmaceutical manufacturers, hospitals, retail pharmacies and other healthcare providers, to share information and develop strategies to identify and help prevent abuse and diversion.

- We work collaboratively with law enforcement and regulators to combat bad actors who attempt to breach the security of the legitimate supply chain, coordinating with law enforcement and regulators to offer information technology, security and logistics expertise that helps locate and prosecute individuals who attempt to misuse and divert prescription drugs from the legitimate supply chain.

- We take steps to "know our customers," including actively assessing and reviewing purchases from pharmacies and healthcare providers that order controlled substances to monitor and report to the DEA if a customer's controlled substances volume or pattern of ordering might signal inappropriate use of the product. If inappropriate use is suspected, distributors work proactively with DEA, local law enforcement and others to help in the investigation of potential diversion cases.

- We provide the DEA with additional data and reports to aid their efforts to seek out criminal behavior. Distributors communicate about any handling of selected controlled substances to the DEA's reporting system, Automation of Reports and Consolidated Orders System (ARCOS). This system monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to the point of sale at the dispensing/retail level.

48.     Beyond their industry commitments and trade group pledges, as entities involved in the distribution and sale of dangerous opioid medications, Defendant distributors were engaged in an abnormally and/or inherently dangerous activity and, thus, had a heightened duty of care under West Virginia law.

49.     Defendants were on notice that the controlled substances they distributed or prescribed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy, or problematic purposes.

50.     Defendant distributors purchased opioids from manufacturers and sold them to pharmacies throughout McDowell County.

51.     Defendant distributors knew or should have known that they were supplying vast amounts of dangerous drugs to small markets that were already facing abuse, diversion, misuse and other problems associated with the opioid epidemic.   Though they had a duty to the consuming public, collectively and individually, Defendant distributors failed to take any action to prevent, minimize, or reduce the distribution of these dangerous drugs.

52.     Likewise, individuals in West Virginia cannot obtain opioids without a prescription written by a licensed medical provider.   Dr. Cofer was a licensed medical provider in West Virginia over the relevant time period.   Dr. Cofer provided written opioid prescriptions for patients despite knowing that the opioids were likely to be abused, diverted, or misused.   Dr. Cofer knew or should have known his actions resulted in patients obtaining dangerous drugs that they did not need, were likely to be abused, or were likely to be resold on the street.

53.     Defendants were on notice that West Virginia law required them, inter alia, to provide effective controls and procedures to guard against diversion of controlled substances, pursuant to 15 C.S.R. § 2-4.21 and 2-4.4 and the WV Controlled Substances Act.

54.     The result of Defendants' collective actions has been catastrophic for nearly everyone in McDowell County except the Defendants.

**The Role of the Distributors**

55.     McKesson, Cardinal, and ABDC are all in the business of pharmaceutical distribution.   These Defendants, collectively referred to as Defendant Distributors, knew, or should have known that West Virginia had an exceedingly high rate of illegal use and diversion of prescription opioids.   Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in West Virginia.

56.     According to a study from the Trust for America's Health and the Robert Wood Johnson Foundation that focused on overdose statistics from 2009 to 2013, West Virginia has the highest overdose rate in the country.

57.     The HDA created "Industry Compliance Guidelines" based upon Drug Enforcement Agency requirements which stressed the critical role of each member of the supply chain in distributing controlled substances.  These industry guidelines provided: "At the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."  Indeed, the HDMA advises all distributors to "Know Your Customer."

58.     Defendant Distributors have shipped millions of doses of highly addictive controlled pain killers into McDowell County, many of which should have been stopped and/or investigated as suspicious orders.

59.     Upon information and belief, Defendant Distributors failed to adopt or implement effective affirmative efforts to prevent diversion of their medicines for illegal or abusive purposes.

60.     When the population of the county is taken into consideration, Defendant Distributors delivered an excessive and unreasonable number of highly addictive controlled substances in McDowell County.

61.     Defendant Distributors undertook no discernible efforts to determine whether the volume of prescription pain killers it was shipping to McDowell County was excessive and whether any of the orders it filled qualified as suspicious orders, which should have been refused.

62.     Upon information and belief, Defendant Distributors have failed to refuse to ship or supply controlled substances to McDowell County pharmacies, between 2007 and the present.

63.     Defendant Distributors knew or should have known that they were supplying opioid medications far in excess of the legitimate needs for McDowell County.

64.     Defendant Distributors knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers they supplied to pharmacies and drug stores in McDowell County were being diverted to illegal use or abuse.

65.     Defendant Distributors had a legal duty to ensure they were not filling suspicious orders.

66.     The sheer volume of highly addictive opioid pain medications Defendant Distributors shipped to McDowell County from 2007 through the present was suspicious on its face.

67.     Upon information and belief, Defendant Distributors made little to no effort to visit the pharmacies and drug stores in McDowell County to which they shipped substantial amounts of prescription medication to do due diligence to ensure the medications they were shipping were not diverted to illegal uses.

68.     Rather, Defendant Distributors paid their sales force employees' and managers' bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to McDowell County.

69.     Defendant Distributors made substantial profits from the drugs which were sold in McDowell County.

70.     Defendant Distributors knowingly filled, and failed to report, suspicious orders in McDowell County from 2007 to the present.

71.     Defendant Distributors' intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of McDowell County and its residents.

72.     As an example, in 2010, McDowell County had a total population of approximately 22,000 individuals with approximately 20% of those being under the age of eighteen, leaving an adult population of approximately 17,500.[12]

73.     According to McKesson's represented market share, it should have anticipated serving one third of the population, or about 5,775 individuals.  According to CDC averages, McKesson should have anticipated providing prescriptions for about 400 of these McDowell County residents who received a valid prescription for a pain killer during any thirty day period.  Upon information and belief, from 2007 to 2012, McKesson supplied 9,393.7 doses for each anticipated patient in McDowell County.

74.     Defendant Distributors thus knew or should have known the amount of Oxycodone and Hydrocodone they supplied to McDowell County was in excess of any amount reasonable to serve a community as small as McDowell County.

75.     The claims and allegations contained herein should come as no surprise to the Defendant Distributors.

76.     In 2008 McKesson paid the Department of Justice $13.25 million for failing to comply with its obligations under the Controlled Substances Act.  Specifically, the government alleged that McKesson failed to report suspicious orders for opioids from internet pharmacies.

---

[12] *See* U.S. Census Bureau, *QuickFacts, McDowell County, West Virginia*, *available at* http://www.census.gov/quickfacts/chart/POP010210/54047; *id*., *Profile of General Population and Housing Characteristics: 2010*, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

77.     On January 17, 2017, the Department of Justice announced it had reached another settlement with McKesson Corporation, this time to pay $150 million to resolve allegations McKesson had violated the Controlled Substances Act by filling millions of orders for drugs, including highly addictive opioids, without sufficient anti-abuse safeguards.

78.     According to the press release, "[f]rom 2008 until 2013, McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic," the DOJ said in the release.[13]

79.     As part of the nationwide settlement, McKesson agreed to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan, and Florida for multiple years, which the DOJ touted as the "most severe sanctions ever" agreed to by a Drug Enforcement Administration registered distributor.

80.     Similarly, in 2008 Cardinal paid a $34 million fine for failing to report suspicious orders of hydrocodone. More recently, in 2012 Cardinal's Lakeland, Florida warehouse was suspended by the DEA for two years as a result of shipping suspect orders of opioids.

### The Role of Dr. Cofer

81.     Despite being a licensed physician, Dr. Cofer undertook no efforts to determine whether the volume of prescription pain killers he was prescribing to his patients was excessive and whether any of the prescriptions he wrote should have been refused.

82.     Dr. Cofer knew or should have known that he was prescribing opioid medications far in excess of the legitimate needs for McDowell County residents.

---

[13] Dep't of Justice, U.S. Attorney's Office, Middle District of Florida, *McKesson Agrees To Pay Record $150 Million Settlement For Failure To Report Suspicious Orders Of Pharmaceutical Drugs* (Jan. 17, 2017), *available at* https://www.justice.gov/usao-mdfl/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

83.     Dr. Cofer knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers he wrote for residents of McDowell County or for patients whose prescriptions were filled within McDowell County, were being diverted to illegal use or abuse.

84.     Dr. Cofer had a legal duty to ensure he was not prescribing suspicious orders.

85.     The sheer volume of highly addictive opioid pain medications Dr. Cofer wrote from 2007-present was suspicious on its face.

86.     Indeed, Dr. Cofer was investigated by the Complaint Committee of the West Virginia Board of Medicine for improper prescribing of narcotic pain medication.  In March 2015, the Committee initiated a second investigation of Dr. Cofer based on a report from the West Virginia Controlled Substance Monitoring Program Database Review Committee (CSMP Review Committee).

87.     The CSMP Review Committee notified the West Virginia Board of Medicine that a review done by the chief medical examiner of two drug overdoses could be traced to prescriptions written by Defendant for controlled substances.  The overdoses resulted in the death of two patients.

88.     In addition to the two patients who died, 14 other patients who had been prescribed controlled substances were included in the review by the West Virginia Board of Medicine.

89.     The West Virginia Board of Medicine concluded that Dr. Cofer's medical records did not contain evidence of routine use of controlled substance agreements or routine drug screens prior to 2015.

90.     The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited documentation that drug screens were reviewed and documented in the patient record.

91.     The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited evidence that the Controlled Substance Monitoring Program database was queried in conformity with West Virginia statute (W. VA. Code R. §11-10-1 et. seq.).

92.     On or about February 6, 2016, Dr. Cofer agreed with the stipulated Findings of Fact and Conclusions of Law reached by the West Virginia Board of Medicine.

V.      **CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE OF DEFENDANT DISTRIBUTORS**

93.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 92.

94.     Defendant Distributors are distributors of controlled substances and must comply with both the laws of West Virginia and with industry customs and standards.

95.     Industry standards require these Defendants to:

- know its customers,

- know its customer base,

- know the population base served by a particular pharmacy or drug store,

- know the average prescriptions filled each day,

- know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases,

- have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

- know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribes.

96.     Defendant Distributors negligently failed to ensure its conduct conformed to industry standards.

97.     Defendant Distributors negligently failed to ensure its conduct conformed to West Virginia law and regulations.

98.     Defendant Distributors negligently failed to conform its conduct conformed to the duties imposed by common law.

99.     As licensed registrants with the West Virginia Board of Pharmacy, McKesson, AmeriSource and Cardinal were required to submit suspicious order reports.

100.    McKesson, AmeriSource and Cardinal failed to submit, or fully disclose suspicious orders.

101.    Likewise, Defendant Distributors negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom reasonably can be expected to become addicted or to engage in illicit drug transactions.

102.    The aforementioned conduct was a direct breach of the duty Defendant Distributors owed to Plaintiff which was the proximate cause of Plaintiff suffering damages.

## COUNT II
## NEGLIGENCE OF DR. COFER

103.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 92.

104.    Medicare data obtained for the years 2012 through 2014 showed a steady increase in the number of claims filed by Dr. Cofer for Medicare Part D.  In 2012, Dr. Cofer filed 7,133 claims; in 2013, Dr. Cofer filed 10,238 claims; and in 2014, Dr. Cofer filed 12,468 claims. [14]

105.    Data obtained from an agency of the United States government for 2013 revealed that Dr. Cofer prescribed schedule II drugs to 19% of the 397 Medicare patients examined in 2013.  The average among all physicians was only 5%.

106.    Dr. Cofer wrote 308 prescriptions (to include refills) for Oxycodone HCL[15] to Medicare patients in 2013.  Based on an average of 30 pills per prescription, this equaled 9,240 pills.

107.    The 308 prescriptions for Oxycodone HCL was the second highest prescribed medication by Dr. Cofer in 2013.

108.    Data obtained from an agency of the United States government for 2014 revealed that Dr. Cofer filled at least one prescription for an opioid to 57% of the 449 Medicare patients examined in 2014.  The average among physicians was only 25%.

109.    Dr. Cofer wrote 387 prescriptions (to include refills) for Oxycodone HCL to Medicare patients in 2014.  Based on an average of 30 pills per prescription, this equaled 11,610 pills.

110.    The 387 prescriptions of Oxycodone HCL was the third highest prescribed medication by Dr. Cofer in 2014.

---

[14] All Medicare data for Dr. Cofer was located at ProPublica.org.
[15] The FDA's Controlled Substance Act (CSA) lists Oxycodone HCL as a Schedule II Controlled Substance.  The DEA defines Schedule II drugs as having a high potential for abuse which may lead to severe psychological or physical dependence.

111.    In January 2015, the Complaint Committee of the West Virginia Board of Medicine (West Virginia Board of Medicine) initiated an investigation of Dr. Cofer for improper prescribing of narcotic pain medication.

112.    In March 2015, the West Virginia Board of Medicine initiated a second investigation of Dr. Cofer based on a report from the West Virginia Controlled Substance Monitoring Program Database Review Committee (CSMP Review Committee).

113.    The CSMP Review Committee notified the West Virginia Board of Medicine that a review done by the chief medical examiner of two drug overdoses could be traced to prescriptions written by Dr. Cofer for controlled substances.  The overdoses resulted in the death of two patients.

114.    In addition to the two patients who died, 14 other patients who had been prescribed controlled substances were included in the review by the West Virginia Board of Medicine.

115.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records did not contain evidence of routine use of controlled substance agreements or routine drug screens prior to 2015.

116.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited documentation that drug screens were reviewed and documented in the patient record.

117.    The West Virginia Board of Medicine concluded that Dr. Cofer's medical records contained limited evidence that the Controlled Substance Monitoring Program database was queried in conformity with West Virginia statute (W. VA. Code R. §11-10-1 et. seq.).

118.    On or about February 6, 2016, Dr. Cofer agreed with the stipulated Findings of Fact and Conclusions of Law reached by the West Virginia Board of Medicine.

119.    As a practicing physician treating patients who lived or worked in McDowell County, Dr. Cofer owed a duty of care to the residents of McDowell County and to McDowell County itself.

120.    Dr. Cofer's negligent acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia.

121.    Dr. Cofer's negligent acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

122.    Dr. Cofer's negligent acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

123.    Dr. Cofer's negligent violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

124.    Dr. Cofer's negligent acts and omissions have proximately caused and substantially contributed to damage suffered by Plaintiff.

<u>COUNT III</u>
**DEFENDANT DISTRIBUTORS' VIOLATION OF W.VA. CODE §§ 60A-8-1 and 55-7-9**

125.    Plaintiff incorporates by reference the allegations contained in paragraph 1 through 92.

126.    Defendant Distributors intentionally contributed to the prescription drug abuse epidemic in the state of West Virginia, and specifically in McDowell County, through repeated

intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act as well as through reckless disregard to the safety and well-being to the citizens of West Virginia.

127.    Through their actions outlined herein, Defendant Distributors intentionally failed to meet or otherwise misrepresented their compliance with the requirements of W.Va. Code § 60A-8-1 *et seq*. and otherwise intentionally violated the West Virginia Uniform Controlled Substances Act.

128.    Defendant Distributors intentionally failed to ensure their conduct conformed to industry standards, West Virginia law and other regulations.

129.    Defendant Distributors intentionally turned a blind eye toward industry standards, West Virginia law, and other regulations by regularly distributing obscenely large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

130.    Defendant Distributors' intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia generally, and specifically in McDowell County.

131.    Defendant Distributors' intentional acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

132.    Defendant Distributors' intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes including but not limited to those written by Dr. Cofer.

133.    Defendant Distributors' intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

134.    Defendant Distributors' intentional acts and omissions have proximately caused and substantially contributed to damage suffered by McDowell County, and created conditions which contribute to the violation of West Virginia laws by others.

135.    Defendant Distributors' intentional   acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff and were in violation of the customs, standards and practices within Defendants' own industries.

136.    Upon information and belief, Defendant Distributors continue to intentionally violate West Virginia laws and regulations, Defendant Distributors' industry customs, and other standards and practices which continue to proximately cause substantial damages to Plaintiff.

**COUNT IV**
**DR. COFER'S VIOLATION OF W.VA. CODE §§60A-4-401 and 55-7-9**

137.    Plaintiff incorporates by reference the allegations contained in paragraph 1 through 92.

138.    Dr. Cofer constructively delivered controlled substances requiring valid prescriptions by the issuance of purported prescriptions on behalf of patients who received the controlled substances from various pharmacists who filled such prescriptions either in McDowell County, for McDowell County residents, or otherwise for recipients of said substances whose actions harmed or impacted Plaintiff.

139.    Dr. Cofer issued such prescriptions intentionally or knowingly outside the usual "course of professional practice or research," thereby not engaging in the authorized activities of a "practitioner," as defined in W.Va. Code, 60A–1–101(v), as amended.    Dr. Cofer's prescriptions were issued intentionally or knowingly without a legitimate medical other authorized purpose.

140.    By virtue of Dr. Cofer's actions, he constructively delivered controlled substances in violation of W.Va. Code, 60A–4–401(a), as amended, which is part of West Virginia's Uniform Controlled Substances Act.

141.    Dr. Cofer's intentional violations of West Virginia law make him liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

142.    Dr. Cofers' intentional acts and omissions have proximately caused and substantially contributed to damage suffered by McDowell County, and created conditions which contribute to the violation of West Virginia laws by others.

**COUNT V**
**UNJUST ENRICHMENT**

143.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 92.

144.    As a result of all Defendants' actions, Plaintiff has expended substantial amounts of money annually that it would not have otherwise expended on numerous services, including, but not limited to: law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, emergency, healthcare and medical services and drug abuse education and treatment, public utilities, nuisance abatement, property damage repair, and code enforcement.

145.    Plaintiff has lost tax revenue and incurred direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

146.    Plaintiff will continue to incur these increased costs, or continue to suffer these losses, in the future as a result of the Defendants' conduct listed herein.

147.    Collectively, all Defendants made substantial profits while fueling the prescription drug epidemic in West Virginia and McDowell County.

148.    Defendant Distributors continue to receive considerable profits from the distribution of controlled substances in McDowell County.

149.    Defendants were each unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

150.    Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing have unjustly enriched the Defendants and are directly related to the damages, losses, and to the detriment of the Plaintiff.

151.    Defendants are liable to Plaintiff for all damages incurred as a result of Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing contained herein.

152.    Plaintiff's payment for these damages on Defendants' behalf conferred beneficial services on Defendants; satisfied a debt or duty owed by Defendants; added to the Defendants' security or advantage, and/or saved Defendants' expense or loss.

153.    Defendants' negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing entitle Plaintiff to disgorgement of the profits received by

Defendants for all sales it made in McDowell County or to McDowell County residents from 2007 to present.

## <u>COUNT VI</u>
## PUBLIC NUISANCE

154.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 92.

155.    Defendants sold, prescribed or distributed opioids in a manner that created or participated in creating a public nuisance that is harmful and injurious to McDowell County and its residents.

156.    Defendants knowingly, intentionally, recklessly, and/or negligently, disseminated massive quantities of opioids to suspect physicians and pharmacies and into the black market, drug rings, pill mills, and dealers.

157.    Defendants also enabled and/or failed to prevent the illegal diversion of opioids into the black market, including through drug rings, pill mills, and other dealers in McDowell County, with actual knowledge, intent, and/or reckless or negligent disregard that such pills would be illegally trafficked and abused.

158.    Defendants' conduct annoys, injures, and/or endangers the comfort, repose, health, and safety of others.  In addition, Defendants' conduct caused and continues to cause harm to McDowell County and its residents.

159.    As such, Defendants' wrongful conduct has given rise to a public nuisance, including the unlawful availability and abuse of opioids and addiction within McDowell County.

160.    The rights, interests, and inconvenience to McDowell County and the general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the illegal diversion, abuse, misuse and negligent proliferation of opioids.

161.    McDowell County is entitled to abate the public nuisance and to obtain damages occasioned by the public nuisance.

## COUNT VII
## INTENTIONAL ACTS AND OMISSIONS

162.    Plaintiff incorporates, by reference, all allegations in Paragraphs 1¬92.

163.    Defendants intentionally contributed to the prescription drug abuse epidemic in McDowell County through repeated intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act and through reckless disregard to the safety and well-being to the citizens of McDowell County, to wit:

- Defendants intentionally and improperly dispensed, and continues to dispense prescriptions contrary to W.Va. Code § 60A-3-308;
- Defendants intentionally engaged in prohibited acts, contrary to W.Va. Code §§ 60A-4-401 through 403;
- Defendants intentionally abetted and continue to abet individuals in deceiving and attempting to deceive medical practitioners in order to obtain prescriptions in violation of W.Va. Code § 60A-4-401.
- Defendants intentionally failed to meet the requirements of W.Va. Code § 60A-8-1 et seq.
- Defendants intentionally conspired to violate the WV Uniform Controlled Substances Act.
- Defendants intentionally failed to ensure its conduct conformed to industry standards.
- Defendants intentionally failed to ensure its conduct conformed to West Virginia law and regulations.
- Defendants intentionally turned a blind eye toward the foregoing industry standards by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

164.    Defendants' intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in McDowell County.

165.     Defendants' intentional acts and omissions ultimately supplied millions of doses of commonly-abused, highly addictive controlled substances to patients of pill mills and physicians like Dr. Cofer with no legitimate medical evidence supporting the prescription.

166.     Defendants' intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

167.     Defendants' intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W. Va. Code § 55-7-9.

168.     Defendants' intentional acts and omissions have proximately caused and substantially contributed to damage suffered by McDowell County, and created conditions which contribute to the violation of West Virginia laws by others.

169.     Defendants' intentional acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiff and were in violation of the customs, standards and practices within Defendants' own industry.

170.     Upon information and belief, Defendants continue to intentionally violate West Virginia laws and regulations, and Defendant's industry customs, standards and practices, and continue to proximately cause substantial damages to Plaintiff.

**VI.     PRAYER**

WEHREFORE, Plaintiff prays that the Court grant the following relief:

1.     Order a jury trial on all issues so triable to determine damages as a result of the Defendants' actions outlined in this Amended Complaint

2.     Enter Judgment in favor of Plaintiff;

3.     Enter a temporary restraining order which:

   a.     Prevents Defendants from continuing to violate West Virginia laws;

     b.     Mandates that Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in McDowell County;

     c.     Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in McDowell County for any non-legitimate medical purpose;

     d.     Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause.

4.     Enter a permanent restraining order which:

     a.     Prevents Defendants from continuing to violate West Virginia laws;

     b.     Mandates that Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in McDowell County;

     c.     Mandates Defendants submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in McDowell County for any non-legitimate medical purpose; and

     d.     Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause.

5.     Order equitable relief, including, but not limited to restitution and disgorgement;

6.     Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7.     Award attorneys' fees and costs, and

8.     Award such other relief as this Court deems just and fair.

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Dated: February 24, 2017                    Respectfully submitted,

                                             */s/ John Yanchunis*
                                            John Yanchunis *(Pro Hac Vice filed in*
                                            *State Court)*
                                            Florida Bar No. 324681
                                            jyanchunis@forthepeople.com
                                            **MORGAN & MORGAN COMPLEX**
                                            **LITIGATION GROUP**
                                            201 N. Franklin St., 7th Floor
                                            Tampa, FL 33602
                                            (813) 223-5505

                                            James Young *(Pro Hac Vice to be filed)*
                                            Florida Bar No. 567507
                                            jyoung@forthepeople.com
                                            **MORGAN & MORGAN COMPLEX**
                                            **LITIGATION GROUP**
                                            76 S. Laura St., Suite 1100
                                            Jacksonville, FL 32202
                                            (904) 398-2722

                                            Harry F. Bell, Jr., Esq. (WV BAR NO. 297)
                                            **THE BELL LAW FIRM PLLC**
                                            P.O. Box 1723
                                            30 Capitol St.
                                            Charleston, WV 25326-1723
                                            Email: hfbel@belllaw.com
                                            Phone: 304-345-1700

                                            Mark E. Troy, Esq. (WV BAR NO. 6678)
                                            **Troy Law Firm, PLLC**
                                            222 Capitol Street, Suite 200A
                                            Charleston, WV 25301
                                            Email: mark@troylawwv.com
                                            Phone 304-345-1122

                                            *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 24, 2017, I electronically filed a true and correct copy of the foregoing unopposed motion with the Clerk of the Court using the CM/ECF system, which will send notification to all attorneys of record in this matter.


/s/ *John Yanchunis*